William J. Journey
Plaintiff, pro se
P.O. Box 72969
Fairbanks, Alaska 99707
Ph: (907)389-2858
Fax: (907)389-2859
E-mail: dogsledteam@hotmail.com

FILED
US DISTRICT COURT
DISTRICT OF ALASKA

2006 OCT 20  PM 4: 05



IN THE UNITED STATES DISTRICT COUT

FOR THE DISTRICT OF ALASKA

WILLIAM J. JOURNEY, pro se,          }
                                     }
      Plaintiff,                     }     **4:06-cv-00034-RRB**
                                     }
v.                                   }
                                     }     COMPLAINT
UNITED STATES OF AMERICA             }
                                     }
      Defendants.                    }

      *"Death is medically inevitable.  Medical attempted murder is not medical malpractice; and is altogether intolerable."*

      This is a Federal Tort Claims Act (FTCA) lawsuit. 28 U.S.C. sec. 1346(b), sec. 1402(b), sec. 2401(b) and sec. 2671-2680.  Only the United States of America may be sued under FTCA.

      1.    Plaintiff, pro se, [a non-attorney] comes now before the United States District Court for the District of Alaska about medical malpractice, personal injury, and other matters he attempted to resolve administratively,

1

ORIGINAL

more than 2 years ago, with the defendant, without results. Defendant, finally denied  plaintiff's 2d administrative tort claim, on or about, *April 26, 2006*, for the sum certain amount of $10,000,000.00. [Certified Mail No: 7005 0390 0002 5180 5465]. Further, plaintiff, pro se, has made a "Good Faith" effort to avoid lodging his complaint with defendant; and, as a non-attorney, he has done the best that he can developing his complaint.

*2.*  Defendant rated plaintiff, pro se, *service-connected veteran less than 100% and also adjudicate him "Unemployable", with no further exam controls established since improvement is not anticipated ["Permanent and Total Disability*], effective: *November 29, 1994*.

3.  Pursuant to defendants IL [Information Letter] 10-97-035, "*Eligibility Criteria For VA Health Care To Veterans Who Have A Total Disability Rating Based On Unemployability*" dated: *September 18, 2002*, states:

> *1. a. "Veterans who are VA rated service-connected less than 100% and also adjudicated as being "Unemployable," are eligible for any medical care benefit administered under Title 38 United States Code, Chapter 17, which would be provided to any other veteran who has a Department of Veterans Affairs (VA)*

> service-connected rating of 100 percent.
> This includes the full array of inpatient,
> outpatient, and fee basis care."
>
> b. "Eligibility for unauthorized medical
> services for a non-service connected condition
> requires that, in 'Unemployable,' the veteran
> must be adjudicated as 'Permanent and
> Totally" disable.

4. Pursuant to *38 C.F.R. sec. 4.16*, plaintiff, pro se, must annually, complete *VA Form 21-4140-1*, "Employment Questionnaire"; re-certifying his present, and existing status [under penalty of law], to maintain his, present and existing, rating [by defendant]: *service-connected veteran less than 100% and also adjudicate "Unemployable", with no further exam controls established since improvement is not anticipated ["Permanent and Total Disability]*. Plaintiff, pro se, complied with defendant's mandate, and requirement; and completed VA Form 21-4140-1, on: *July 26, 2006.*

5. Failure to act on an administrative claim within six months of presentment can, at the option of the claimant, be treated as a denial of the administrative claim after the six months has passed. *28 U.S.C.*

3

*sec. 2675(a)*. *Plaintiff, pro se, decided, and chose, to give defendants additional time, over and above, the six month limit, to make a decision on his administrative claim; in an attempt to resolve the medical malpractice and personal injury issues, outside the court.* Unfortunately, and regrettably, defendants took more than 2 years to deny plaintiff, pro se, FTCA claim. Unless the administrative claim is denied, six month statute of limitations does not begin to run and a claimant has an indefinite time within which to file suit. *28 U.S.C. sec. 2675(a)*; *Douglas v.United Sates*, 658 F.2d 445, 449-450 (6th Cir. 1981). The last date plaintiff, pro se, can file his lawsuit is *October 26, 2006*.

6. Plaintiff, pro se, is a citizen of the United States of America. Plaintiff enlisted into the United States Army, in 1971, and he was honorably discharged from the Army, in 1980 [DD Form 214, "United States Department of Defense, '*Certificate of Discharge from Active Duty*'". Further, plaintiff has resided in Alaska, since 1980 [more than 26 years]; and he satisfies Alaska's residency requirement.

4

7. At all times, the medical malpractice, personal injury, and other matters occurred in the State of Alaska. The duty of the defendant in a tort action is defined in accordance with the law of the state where the negligence occurred. *Richard v. United States*, 369 U.S. 1 (1962).

8. The FTCA covers acts or omissions of employees of Executive departments, Legislative Branch employees for non-legislative acts of the Congress, *McNamara v. United States*, 199 F.Supp. 879 (D.D.C. 1961), and Judicial Branch officer for non-judicial acts. *United States v. Le Patourel*, 471 F.2d 405 (8th Cir. 1978); 28 U.S.C. sec. 2671.

9. Plaintiff, pro se, contends there are no FTCA "*exceptions*" specific to this lawsuit, nor sounding as enumerated in *28 U.S.C. sec. 2680*.

10. Plaintiff, pro se, contends there are no "*statute of limitation*" claims relevant to his lawsuit.

11. Plaintiff, pro se, contends *jurisdiction* has been properly established in The U.S. District Court for the District of Alaska.

5

12.  Plaintiff, pro se, contends _venue_ is properly established in The U.S. District Court for the District of Alaska; and claim is more than $75,000.00.

13.  Plaintiff, pro se, is not aware of any _reasonable_, _logical_, or _legal_ explanation, nor _justification_, why defendant took over 2 years to make a decision about plaintiff's 2d administrative tort claim! Plaintiff, pro se, has no control over defendant, nor does plaintiff, pro se, benefit because of defendant's delays; _except for "happen-n-chance" that defendant will resolve administrative tort claim, outside the court._ However, Plaintiff, pro se, contends the benefits realized by defendant's extra-ordinary delay in their decision about plaintiff, pro se, administrative tort claim are rationalized in the very reasons for having statute of limitations: _a. Over time, memories fade, evidence is lost or disappears [or destroyed because of the federal paperwork reduction act], and people want to get on with their lives without legal interference from the past.  b. The diminishing value of evidence.  c. Diligence on the part of injured party in bring the lawsuit._

6

Consequently, because plaintiff, pro se, doesn't benefit *equally* as defendant to their extra-ordinary delays in deciding his 2d administrative tort claims, plaintiff, pro se, is *substantially prejudiced* in prosecuting his complaint, by defendant's actions. Further, plaintiff, pro se, contends that defendant's actions towards adjudicating his administrative tort claim is not their "*normal course of business practice*"; and defendant's *intentionally* delayed adjudicating plaintiff, pro se, administrative tort claim, *knowing they would realize a greater benefit in delaying their decision, because of plaintiff, pro se, ["Good Faith"] efforts to resolve his administrative tort claim, outside of court - and denied plaintiff, pro se, claim more than 2 years of his presentment; and "Paperwork Reduction Act"*. **Further,** if plaintiff, pro se, did not follow the "statute of limitations", defendant, by law, would have an affirmative defense; and plaintiff, pro se, lawsuit would be summarily dismissed, because the court would not have jurisdiction matter, anymore. Statutes of limitations "*are found and approved in all systems of enlightened jurisprudence.*" ***Wood v. Carpenter***,

7

101 U.S. 135, 139 [1879]. Although they provide what legislatures consider a reasonable period for plaintiffs to present their claims, "*they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence.*" **United States v. Kubrick**, **444** U.S. **111, 117** [1979]. Conversely, plaintiff, pro se, is protected from unreasonable delays, in like manner, and reason, as defendants. Further, plaintiff, pro se, contends, he is not the blame, or justification, or reason, for defendant's unreasonable delay to decide his administrative tort claim, more than 2 years after his presentment; because he chose the "option" to wait beyond 6 months, before filing his lawsuit. Plaintiff, pro se, is not responsible from defendants breaches of their own regulations and polices to act according to FTCA mandates!

14. Previous to this complaint, plaintiff, pro se, filed his 1st FTCA lawsuit, in **1999**, against USA; *because Bassett Army Community Hospital Pharmacy "incorrectly filled" plaintiff, pro se, narcotic medication, prescribed by a licensed physician, causing plaintiff, pro se, to suffer a "myocardial infarction", after he took 6 of the*

8

*"incorrectly filled"* medications. **Plaintiff, pro se,**
**1999 FTCA complaint was** *promised* **to be resolved by**
**Veterans Affairs, pursuant to** *38 C.F.R. sec. 1151*, **as it**
**was explained to him through the Asst. U.S. Attorney**
**General; as agreed to by VISN 20, Regional Counsel.**
**Therefore,** *plaintiff, pro se, saw no need to pursue his*
*complaint any further through the court; and plaintiff, pro*
*se, agreed to dismiss his complaint; for good order and*
*justice.* **Plaintiff, pro se, contends Asst. U.S. Attorney**
**General was** *deceived*, **by VISN 20, Regional Counsel,** *promise*
**to adjudicate  plaintiff, pro se, complaint pursuant to** *38*
*C.F.R. sec. 1151*. **Consequently, and in turn, Asst. U.S.**
**Attorney General unintentionally, unknowingly, and**
**unwillingly** *deceived* **plaintiff, pro se, that his complaint**
**would be adjudicated, pursuant to** *38 C.F.R. sec. 1151*.
**Further, Asst. U.S. Attorney General prepared "boiler"**
**plate dismissal, which plaintiff pro se, signed.**
**Plaintiff, pro se, further contends, even though FTCA and**
*38 C.F.R. 1151* **are separate; the "statute of limitations",**
**in 1999 FTCA, is tolled; as a matter unresolved between**
**plaintiff, pro se, pursuant to a** *"promise"* **made by Asst.**
**U.S. Attorney General. In the alternative, plaintiff,**

pro se, requests the court to order "sanctions" against defendant, in substitution for their *promise*; and order 1999 medical malpractice, admitted, for the good order and justice.

15.  For purpose of edification and clarification, Plaintiff, pro se, explains the events leading to the 1999 FTCA lawsuit.  Plaintiff, pro se, contends this edification and clarification has chronological significance to existing FTCA lawsuit, because of defendants conscious and continuous efforts to hide fraudulent and false testimony and evidence, during 1997 BACH QAI [Quality Assurance Investigation]; and as a matter unresolved between plaintiff, pro se.

16.  *It is an indisputable fact*, in 1997, Alaska VA Healthcare System & Regional Office [AKVAHSRO] properly authorized, pursuant to *Public Law 104-262*, plaintiff, pro se, "fee-basis" [non-VA physician] appointment for service-connected disability, with Dr. Lindig, M.D., Orthopedic Surgeon.  *It is another indisputable fact*, at that appointment, Dr. Lindig, M.D., examined plaintiff, pro se, and prescribed narcotic pain medication, DEMEROL.

*It is another indisputable fact*, AKVAHSRO
properly authorized plaintiff, pro se, to fill his
prescription, DEMEROL, at Bassett Army Community Hospital
Pharmacy [BACH]. *It is another indisputable fact*, Bassett
Army Community Hospital Pharmacy "incorrectly filled"
plaintiff, pro se, narcotic prescription. *It is another
indisputable fact*, plaintiff, pro se, took 6 of the
"incorrectly filled" narcotic medication, causing him to
get violently sick, vomiting uncontrollably - spewing
blood; until he passed-out on his couch. Plaintiff, pro
se, awoke on his couch, not feeling quite himself,
suffering an extreme headache, numbness, and his "heart was
hurting". *It is another indisputable fact*, on that date,
plaintiff, pro se, was telephonically contacted by BACH
pharmacy and given notice that they had "incorrectly
filled" his narcotic prescription. *It is another
indisputable fact*, BACH asked plaintiff, pro se, if he had
taken any of the "incorrectly filled" narcotic medication,
and he responded he had taken 6 of the "incorrectly filled"
narcotic medication and got violently sick. BACH said "Oh,
no!" [or words to that affect] *It is another indisputable
fact*, BACH ordered plaintiff, pro se, to return the

11

remainder of the "incorrectly filled" narcotic medication, so they could issue the correct prescribed narcotic medication. [During this time, someone in BACH was stealing narcotic medication from patients.] Be that as it may, *it is another indisputable fact*, plaintiff, pro se, returned the remainder of the "incorrectly filled" narcotic medication to BACH; and he asked BACH to *see a doctor, because his "heart was hurting".*

*It is another indisputable fact*, *BACH unlawfully denied plaintiff, pro se, request to see a doctor, because plaintiff, pro se, wasn't a service-member.* This violated the standard of care, practice of medicine; and EMTALA [Emergency Medical Treatment and Labor Act], 42 C.F.R. 489.24. [*At this time, AKVAHSRO & BACH were in the process of negotiating an "Inter-agency Agreement" {now AK-IA-02-0002}*]. *It is another indisputable fact*, *BACH never informed plaintiff, pro se, to date, about the "incorrectly filled" medication, nor the health risks.* This is violation of standard of care, practice of medicine; and "informed" consent. *It is another indisputable fact*, plaintiff, pro se, departed BACH and

**returned home where he called AKVAHSRO; and requested** *pre-approval emergency medical treatment and care at Fairbanks Memorial Hospital Emergency, because BACH [AKVAHSRO "agent", "representative", etc.] "poisoned" plaintiff, pro se, by "incorrectly filled" narcotic medication, causing his "heart to hurt";* **and AKVAHSRO** *denied his request, because plaintiff, pro se, had not been rated for a heart condition.* **This is a violation of standard of care practice of medicine; and EMTALA, 42 C.F.R. 489.24.** [*At this time, plaintiff, pro se, was required by 38 C.F.R. to get pre-approval authorization for emergency medical treatment and care from AKVAHSRO.*] *It is another indisputable fact*, **after several weeks of "Good Faith" efforts and complaining to AKVAHSRO about his "heart hurting" elapsed;** *plaintiff, pro se, filed his 1st administrative tort claim against BACH, as an extreme measure, attempting to get medical treatment and care, because his "heart was hurting".* *It is an indisputable fact*, **because plaintiff, pro se, filed his administrative tort claim against BACH, AKVAHSRO,** *authorized plaintiff, pro se, an appointment with "triage" nurse Ms. Ann Lilly, LPN, Fairbanks VA, COBC, because his "heart was hurting";*

*caused from taking 6 "incorrectly prescribed" narcotic medications by BACH!* [It's a shame plaintiff, pro se, was forced to revert to extreme measures to force a response by AKVAHSRO to act reasonable towards his request for emergency medical treatment and care; and according to his VA rating. If, only, BACH, or AKVASHRO, would have acted appropriately, and according to the standards of care, practice of medicine, laws, rules, regulations, policies, directives, and "agreement" – imposing the least restrictive measures of emergency medical treatment and care - and if, only, they, respectfully, would have complied with plaintiff, pro se, request to see a doctor, all about everything in this complaint would have never happen].

17. Further, before appointment with "triage" nurse, Ms. Ann Lilly, LPN, *it is an indisputable fact*, plaintiff, pro se, *requested AKVAHSRO to initiate a "Quality Assurance Investigation" [QAI] into BACH "incorrectly filling" his narcotic medication, and they denied his request. It is an indisputable fact*, AKVAHSRO substantially stated, *it was not necessary for them to*

initiate a QAI; when BACH QAI was investigating their own incident. Consequently, plaintiff, pro se, has been substantially prejudiced by defendant's actions denying his request for QAI, about BACH "incorrectly filling" plaintiff, pro se, narcotic medication.

18. *It is an indisputable fact*, Plaintiff, pro se, contacted BACH requesting to participate in their QAI and BACH informed him the QAI had been finalized, based on pharmacist's testimony. Plaintiff, pro se, asked BACH how they could have a complete QAI absent his [victim] participation and testimony; and BACH responded the matter has been finalized. Plaintiff, pro se, asked for a copy of the QAI and BACH denied his request, because the QAI was an internal investigation; and not for his benefit. Plaintiff, pro se, has been substantially prejudice by BACH QAI; and has been denied any opportunity to rebut pharmacist's testimony of record, which adversely affects his VA benefits and compensation. [The Supreme Court held in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) that an individual has a protectable interest in reputation. "Where a person's good name, reputation, honor, or

integrity is at stake because of what the government is
doing to him, notice and an opportunity to be heard are
essential."]

19.  At appointment with "triage" nurse, Ms. Ann
Lilly, LPN, she informed plaintiff, pro se, that BACH QAI
reported he had returned all of the "incorrectly filled"
narcotic medication to them; and based on that report,
she couldn't understand the connection between his "heart
hurting" and the medication. Plaintiff, pro se,
responded *the report was false; and it was impossible
for him to return all of the "incorrectly filled" narcotic
medication to BACH, when he had taken 6 of the "incorrectly
filled" medications, causing him to get violently sick and
his "heart to hurt"*. Further, plaintiff, pro se, asked
Ms. Lilly, LPN, to refer him to a cardiologist and let
him/her decide what caused his "heart to hurt", all of a
sudden.  Ms. Lilly, LPN, responded *she was not authorized
to make a cardiology consult absent a doctor's order.*
Then, plaintiff, pro se, requested Ms. Lilly, LPN refer him
to a doctor; and she recommended  [fee-basis] [Ms.] Dr.
Kohnen, M.D., *for the cardiology consult.*

20. At appointment with [fee-basis] Dr. Kohnen, M.D., she examined and tested plaintiff, pro se, and diagnosed, *more likely than not, he suffered a stroke; instead of a heart attack.* And, she further stated that plaintiff, pro se, *"heart hurting" originated in his lungs, probably caused by his history of tobacco use [or "nicotine dependency"].* Plaintiff, pro se, responded that the purpose of his appointment with her was to get *a doctor's referral to a cardiologist, because his "heart was hurting" because Ms. Lilly, LPN, Fairbanks VA, CBOC, couldn't order a cardiology consult; absent a doctor's order.* Dr. Kohnen, M.D. denied plaintiff, pro se, a cardiology referral. <u>This is a violation of standard of care, practice of medicine; and misdiagnosis of medical condition, "heart attack"</u>. Essentially, *Dr. Kohnen, M.D. misdiagnosis adversely affected his VA benefits; and his opportunity for a "second opinion", by a cardiologist.*

21. After plaintiff, pro se, filed his 1st administrative claim, which was subsequently denied, he waited until the very last date to file his FTCA claim [or almost 6 months later] in federal court. During the

17

interim [or between Dr. Kohnen's medical misdiagnosis, and during FTCA lawsuit], plaintiff, pro se, complained, repeatedly and consistently, to AKVAHSRO about his "heart hurting"; requesting to see a cardiologist, without results. <u>This is a violation of standard of care, practice of medicine; and denial of benefits according to VA rating</u>.

22. During 1st FTCA lawsuit, and after 2 years elapsed from the date of incident [*1997*], and in *1999*, AKVAHSRO, authorized <u>[absent a doctor's order]</u> <u>"nurse practitioner" Ms. Brenda Young, LPN, Fairbanks VA, CBOC, cardiology consult for plaintiff, pro se, to see "fee-basis" Dr. Anscheutz, M.D., Cardiologist, Alaska Heart Institute, Anchorage, Alaska, because plaintiff, pro se, "heart was hurting"</u>. *Defendant never disclosed their reason for waiting over 2 years from the date of incident, 1997, to authorize him to see a cardiologist, pursuant to Ms. Young, LPN, cardiology consult; absent a doctor's order. For some unknown reason, defendant, flip-flopped like a pancake, and authorized his cardiology consult, absent a doctor's order; for the the very reason defendant denied it in the first place.*

18

*Plaintiff, pro se, is befuddled by defendant's actions conduct, and behavior; and he was very grateful to finally see a cardiologist!*

23. At appointment with Dr. Anscheutz, M.D., plaintiff, pro se, was examined, tested and diagnosed to **have** *suffered a "heart attack" [lower end of his heart was damaged and clotted based on "echocardiogram",* in 1999. However, Dr. Anscheutz, M.D. was not able to ascertain the date of occurrence of plaintiff, pro se, heart attack, *because to much time had elapsed from when plaintiff, pro se, first reported his "heart hurting" [1997] to his cardiology appointment [1999].*

24. Dr. Anschuetz, M.D. recommended an "angiogram" procedure to plaintiff, pro se; and plaintiff, pro se, asked Dr. Anschuetz, M.D. if he could do the procedure. Dr. Anschuetz, M.D. responded, "Yes!" However, AKVAHSRO wouldn't authorize him to do an "angiogram", on him.

25. Plaintiff, pro se, requested, pursuant to personal and economical "hardship" AKVAHSRO to authorize Dr. Anschuetz, M.D. to perform further interrogation of his

19

heart condition, by "angiogram", at Alaska Heart Institute, Providence Hospital, Anchorage, Alaska; and AKVAHSRO denied plaintiff, pro se, request; substantially stating: any further medical interrogation of plaintiff, pro se, heart condition had to be accomplished at VA, Seattle, Washington. [*Plaintiff, pro se, to this very date, cannot comprehend the rational, nor reason, defendant believes, it is more economically feasible to send him to Seattle, Washington, for an "angiogram"; then to have the "angiogram" performed at the Alaska Heart Institute. Here in Alaska, it costs less to see a "fee-basis" doctor than a provider at the VA; and an "angiogram" cost less, too!*]

26.   Because Dr. Anscheutz, M.D. is a cardiology specialist; and because plaintiff, pro se, needed a primary care doctor for medical treatment and care for his heart condition; and because Fairbanks VA, CBOC didn't have a doctor; and because AKVAHSRO doctors were 380 miles away from Fairbanks, Alaska, where plaintiff, pro se, was situated; AKVAHSRO authorized and assigned plaintiff, pro se, *"fee-basis", primary care provider, Dr. Barold, M.D. [Internal Medicine], Tanana Valley Clinic, Fairbanks,*

*Alaska, for "continuity of care" for his heart condition;*

*until Dr. Barold, M.D., resigned to relocate outside*

*Alaska.*

27. **Because Dr. Barold, M.D. resigned and relocated**
**outside of Alaska, AKVAHSRO, for "continuity of care"**
**reasons, authorized his replacement,** *Dr. Escobar, M.D.*
*[Internal Medicine], Tanana Valley Clinic, as plaintiff,*
*pro se, primary care provider, until Dr. Escobar, M.D.*
*resigned to work at Fairbanks Memorial Hospital Emergency.*

28. *Between the time Dr. Escobar, M.D. resigned as*
*plaintiff, pro se, primary care provider, and until <u>July</u>*
*<u>3, 2002</u>, AKVAHSRO never reassigned plaintiff, pro se,*
*a replacement primary care provider for "continuity of*
*care" for his heart condition.* **<u>This is a violation of</u>**
**<u>the standard of care, practice of medicine; and contrary</u>**
**<u>to plaintiff, pro se, VA rating.</u>**

29. **During this time, and when plaintiff, pro se,**
**was refilling his medication, he was keenly aware that**
**he was treated indifferently by Fairbanks VA, CBOC, and**
**BACH nurses and employees. While at the pharmacy, Manger,**

"Rosie" approached plaintiff, pro se, about an urgent matter, she needed to discuss with him; and to follow her to an office. While they were in the office, *she accused plaintiff, pro se, of "stalking" her nurse employee, Ms. Ann Lilly, LPN.* Plaintiff, pro se, told Ms. "Rosie" *she was "out-of-her-mind"; and crazy to make such an accusation.* When plaintiff, pro se, had enough of her psychotic behavior, badgering, and intimidating threats of arrest by the Military Police, *he tried to leave and she stopped him; when Ms. Brenda Young, LPN, her employee, entered the room.* Ms. Brenda Young, LPN, informed her supervisor, Ms. "Rosie" she had made a terrible mistake, because *plaintiff, pro se, was not the person who was "stalking" Ms. Lilly, LPN – it was another veteran, who wears a hat similar to plaintiff, pro se.* Plaintiff, pro se, departed Fairbanks VA, CBOC and BACH totally embarrassed, humiliated, and demoralized! [*This most befuddling event had plaintiff, pro se, perplexed, because Ms. Lilly, LPN [Ms. "Rosie" employee] was working that day, and present in the facility. However, it took somebody else, Ms.*

*Young, LPN, to tell Ms. "Rosie" she was wrong accusing*
*plaintiff, pro se, of "stalking" Ms. Lilly, LPN. Why*
*didn't Manager, Ms. "Rosie" talk to Ms. Lilly, LPN,*
*first!?*] Defendant never offered plaintiff, pro se,
any psychological debriefing about this incident; and
Manger, Ms. "Rosie" is simply nonsensical, and mentally
challenged to make such an egregious mistake.

   30.   Because AKVAHSRO denied managed care and
"continuity of care", on or about, *June 21, 2002*,
plaintiff, pro se, informed and complained to Dr. Brian
A. Tansky, M.D., Fairbanks Memorial Hospital Emergency, he
was a heart patient, taking "nitroglycerin" patches x
12 hrs, and aspirin; and his stomach hurt, constipated,
nauseated, no appetite, shortness of breath. Dr. Tansky,
M.D. examined and diagnosed plaintiff, pro se, suffering:
*Colonic distension and constipation*; and prescribed:
*Magnesium citrate, Dulcolax, Reglan, and GI cocktail*,
released him. AKVAHSRO paid the cost for plaintiff,
pro se, emergency medical treatment. [Dr. Tasnky, M.D.
misdiagnosed plaintiff, pro se, "congestive heart
failure".]

31. Because AKVAHSRO denied managed care and "continuity of care", on or about, *June 27, 2002*, plaintiff, pro se, returned to Fairbanks Memorial Hospital Emergency, and informed and complained to Dr. Susan J. Tate, M.D., he was previously seen by Dr. Tansky, M.D., he was a heart patient, taking "nitroglycerin" patches x 12 hrs, and aspirin; and his stomach hurt, nauseated, shortness of breath and heart hurting. Dr. Tate, M.D. examined and diagnosed plaintiff, pro se, suffering: *Umbilical Hernia and constipation*, and prescribed: *Colace and Phenergan*, with follow-up with Dr. Wrigley, M.D., Surgeon. [Initially, AKVAHSRO denied payment of plaintiff, pro se, emergency medical treatment. After almost a year of complaining to AKVAHSRO; and appeal to VISN [Veterans Intergraded Service Network] 20, AKVAHSRO paid for the cost of plaintiff, pro se, emergency medical treatment. [Dr. Tate, M.D. misdiagnosed plaintiff, pro se, "congestive heart failure".]

32. Because plaintiff, pro se, felt like he was dying, on or about, *June 28, 2002*, plaintiff, pro se, saw "Leoy", at Fairbanks VA CBOC, and requested

24

to see a doctor, outside of Fairbanks Memorial Hospital
Emergency; and AKVAHSRO authorized plaintiff, pro se,
medical appointment at Urgent Care, Fairbanks, Alaska.
Plaintiff, pro se, was examined by a doctor and he
diagnosed plaintiff, pro se, *didn't see an Umbilical*
*hernia; however, there was something terribly wrong*
*with him and his facility didn't have the resources*
*to treat* plaintiff, pro se; and referred him to
Dr. Teslow, M.D., Surgeon, the following Monday.
[Urgent Care doctor misdiagnosed plaintiff, pro se,
"congestive heart failure"]

   33.   After Urgent Care appointment, and on the
same date: June 28, 2002, plaintiff, pro se, returned
back to Fairbanks Memorial Hospital Emergency, and
complained to Dr. Tate, M.D., that the *Urgent Care doctor*
*didn't see an Umbilical Hernia.* Dr. Tate, M.D. examined
and diagnosed plaintiff, pro se, suffering: *Abdominal pain,*
*unclear etiology;* and prescribed: *Demerol #25 and*
*Phenergan #25, IV [push]; and instructed plaintiff,*
*pro se, to return back to the hospital in 12 hours.*
[Dr. Tate, M.D., misdiagnosed plaintiff, pro se,

"congestive heart failure".]

34. When plaintiff, pro se, was released by
Dr. Tate, M.D., on or about, *June 28, 2002*, he remembers
only leaving the hospital parking lot driving in
his POV [Privately Owned Vehicle] and three hours
later arriving home [20 miles away from the hospital],
stumbling out of his vehicle, and passing out
at his residence.  Fortunately, plaintiff, pro se,
didn't have an accident returning home from the
hospital; because of narcotic medication.

35. About 12 hours later, on *June 29, 2002*,
plaintiff, pro se, returned to Fairbanks Memorial Hospital
Emergency, and saw Dr. Michael R. Burton, M.D.
Dr. Burton, M.D. reviewed plaintiff, pro se, medicals
and conferred with Dr. Stirling, M.D.  Both doctors
examined plaintiff, pro se, and *emergency hospitalized*
*him, for "poor follow-up" previous to hospitalization.*
Dr. Stirling, M.D. called Dr. Anschuetz, M.D. about
plaintiff, pro se, medical emergency;
and Dr. Anschuetz, M.D. said plaintiff, pro se, was

**suffering** *"congestive heart failure", and diurees him, immediately.* **About 17 lbs of fluid was diurees from plaintiff, pro se, abdomen and chest cavities.**

36. **On or about,** *July 2, 2002*, **Dr. Gina Escobar, M.D. discharged plaintiff, pro se, from the hospital with the following diagnosis:** *1. Left ventricular thrombus on echocardiogram. 2. Congestive heart failure, with ejection fraction of 20%. She prescribed: Lovenox 40 mg, P.O.Q.D, #30 nitro patch, 0.2 mg, per hr., one h.s. #30, Zestril 5 mg, P.O.B.I.D., #60, Coumadin 5 mg, alternating With 5 mg on Monday, Wednesday and Friday and 4 mg on other days. Lovenox 100 mg, sub-q., 12 h, #10 to be sent with plaintiff, pro se.* **Dr. Escobar, M.D. instructed plaintiff, pro se, to follow-up with Dr. James D. McCabe, M.D., Fairbanks VA, CBOC, on** *July 3, 2002*.

37. **Pursuant to Dr. Escobar, M.D. pre-arraigned appointment, and medical orders, plaintiff, pro se, saw Staff Physician, Dr. James D. McCabe, M.D., Fairbanks VA, CBOC, for "post discharge examination",** on *July 3, 2002*. *Because of the 4ᵗʰ of July weekend,*

27

Dr. McCabe, M.D. rescheduled plaintiff, pro se, "post discharge examination", to _July 8, 2002_. This is a violation of standard of care, practice of medicine; violation of defendant's "patient safety" mandate; and violation of "informed consent".

    38.  About 6 hours after plaintiff, pro se, saw, Dr. McCabe, M.D., and on _July 3, 2002_, plaintiff, pro se suffered several heart attacks, and a stroke, and he was escorted to Fairbanks Memorial Hospital Emergency and emergency hospitalized in "ICU", by Dr. Tate, M.D.; after plaintiff, pro se, suffered "sudden death" and returned. Dr. Escobar, M.D. ordered, on _July 5, 2002_, plaintiff, pro se, "life-line" to Alaska Heart Institute, Providence Hospital, Anchorage, Alaska. Dr. William P. Mayer, M.D. was the admitting doctor, at Providence Hospital. Dr. Mayer, M.D. appraisal: "_I believe the patient has a dilated cardiomyopathy, likely on an ischemic versus non-ischemic basis. I believe that his loss of consciousness was due to a transient dysrhumthmia. I believe he has had watershed infarcts. I doubt that these are embolic infarcts, although this remains a possibility._

*Our echocardiogram here shows an ejection fraction of 10%, moderate mitral and tricuspid regurgitation, no evidence of apical thrombus is seen although there is an artifact at the apex which does not move with apical movement. Contrast injection shows no evidence of an apical thrombus. I plan to obtain a neurologic consultation in addition to carotid Dopplers. He will be maintained on Lovenox. I believe that some evaluation of his coronary status should be offered and an AICD will also be offered. He will be treated in the standard fashion with ACE inhibitors, digoxin, Lasix, Aldoctone and eventually with a beta blocker."*

39. On or about, _July 10, 2002_, Dr. Robert L. Pulliam, M.D. [deceased], discharged plaintiff, pro se, from Alaska Heart Institute, Providence Hospital, and diagnosed him suffering: 1. *Severe left ventricular dysfunction due to cardiomyopathy, ejection fraction 20% with moderate mitral regurgitation. 2. Moderate coronary obstruction without any definite ischemia and possible small inferior infarct. 3. Probable watershed distribution strokes, but cannot totally exclude embolic strokes due*

to VP and poor left ventricular function.  4.  History of tobacco abuse [nicotine dependency].  5.  AICD [Automatic Implantable Cardio Diverter]  **Dr. Pulliam, M.D. "cc" Dr. McCabe, M.D., Fairbanks VA, CBOC, and others.  Further, Dr. Pulliam, M.D. ordered plaintiff, pro se, "**_not to deviate from prescribed medications, even by brand name_**"; and for him to follow-up with Dr. McCabe, M.D.**

**40.  On or about, **_July 12, 2002_**, plaintiff, pro se, saw Dr. Footit, M.D., U.S. Army, BACH,** _because Dr. McCabe, M.D. was unavailable for 2d "post discharge examination"._ **Dr. Footit, M.D. examined plaintiff, pro se, prescribed medication** _Coumadin_**, and to follow-up with Dr. McCabe, M.D.**

**41.  On or about, **_July 16, 2002_**, plaintiff, pro se, contacted Dr. Footit, M.D.,** _because Dr. McCabe, M.D. was unavailable_**, about suffering severe headaches.  Dr. Footit, M.D. ordered plaintiff, pro se, to report to Fairbanks Memorial Hospital Emergency, where he would meet him. Plaintiff, pro se, saw Dr. Carroll Phillips, M.D., who**

**examined and diagnosed:** *Acute cephalgia hperfalmeia – recent history of CVA & MI.* **Further**, *Dr. Phillips, M.D. advised plaintiff, pro se, to never come to the "emergency room" alone.* **Dr. Footit, M.D. reviewed Dr. Phillips, M.D. emergency medical treatment and care provided to plaintiff, pro se.**

42. **The next time plaintiff, pro se, briefly saw Dr. McCabe, M.D. after *July 3, 2002*, was on *July 17, 2002*. Dr. Footit, M.D. did plaintiff, pro se, 2d "post discharge examination, on *July 12, 2002*; for his 2d emergency hospitalization. Plaintiff, pro se, never received a "post discharge examination" for his 1ˢᵗ emergency hospitalization, because Dr. McCabe, M.D. rescheduled examination on *July 3, 2002* to *July 8, 2002*,** *because of the 4ᵗʰ of July weekend*. **However, plaintiff, pro se, electronic medicals, at AKVAHSRO,** *falsely reported Dr. McCabe, M.D. performing 1st "post discharge examination" on him on July 8,2002.* **This is a violation of the standard of care, practice of medicine; and intentionally falsely reporting, by Dr. McCabe, M.D., into plaintiff, pro se, electronic**

medicals, in an effort, to hide his mistake and medical malpractice. Further, and consequently, defendant adversely, and officially, "tagged" plaintiff, pro se, with the "title" of being a "noncompliant" patient; in his electronic medicals; because of his complaint.

43. After complaining to Ms. "Rosie", Manager, Fairbanks VA, CBOC, and Asst. Chief, Clinical Affairs, Mr. T. Woodworth, AKVAHSRO, for more than a year, it was "impossible" for Dr. McCabe, M.D. to have performed any "post discharge examination" on him, *because he re-scheduled plaintiff, pro se, "post discharge examination" to July 8, 2002, because of the 4th of July weekend and limited staff; and because plaintiff, pro se, was re-emergency hospitalized at Fairbanks Memorial Hospital, 6 hours after briefly seeing Dr. McCabe, M.D., on July 3, 2002; and because plaintiff, pro se was "life-line", on July 5, 2002, pursuant to Dr. Escobar, M.D. orders, to Alaska Heart Institute, Providence Hospital, Anchorage, Alaska [380 miles away from Dr. McCabe, M.D.], where Dr. Mayer, M.D. admitted plaintiff, pro se, on July 5, 2002, and Dr. Pulliam, M.D., discharged him, on July 10, 2002,*

*from Alaska Heart Institute, Providence*
*Hospital, Anchorage, Alaska; and because between July 5,*
*2002 and July 10, 2002, plaintiff, pro se, was no where in*
*the close proximity to Dr. McCabe, M.D., but 380 miles away*
*from him, on July 8, 2002; and because July 8, 2002 is 3*
*days after July 5, 2002 and 2 days before July 10, 2002;*
*and because it is an "impossibility" for plaintiff, pro se,*
*to be in two places at the same time;* **AKVAHSRO**
**changed plaintiff, pro se, electronic medicals to reflect**
**Dr. McCabe, M.D. performed "post discharge examination"**
**on plaintiff, pro se, for his first emergency**
**hospitalization, on July 3, 2002, instead of July 8, 2002.**
**This is medical malpractice; and fraudulent medical**
**reporting, in an effort, to hide defendant's employee, Dr.**
**McCabe, M.D. violation of the standard of care, practice of**
**medicine for not performing 1st "post discharge examination"**
**on plaintiff, pro se, after his first emergency**
**hospitalization, on July 3, 2002; and to establish**
**plaintiff, pro se, as a "noncompliant" patient; and**
**a direct violation of defendant's "honesty is the**
**best policy", "culture of safety", and "Patient's**

33

Rights" mandates; and "informed consent; and "dereliction of duty" and "abuse of power". *Plaintiff, pro se, doesn't have the opportunity to report into his medicals; only defendant, Dr.McCabe, M.D., and others, have that right to create, and report, anything, accurate or false, into plaintiff, pro se, electronic medical records.* Dr. McCabe, M.D. did not perform a "post discharge examination", on plaintiff, pro se, on *July 3, 2002*.

44. Further, Dr. McCabe, M.D., had to know, he didn't perform "post discharge examination" on *July 3, 2002*, because he rescheduled plaintiff, pro se, examination to *July 8, 2002*. Dr. McCabe, M.D. said nothing about his mistake, error, and inaccurate medical reporting into plaintiff, pro se, electronic medicals; even though he, had to know, it was "impossible" for him to have completed a "post discharge examination" on plaintiff, pro se, on *July 8, 2002*, because plaintiff, pro se, electronic medicals clearly showed, otherwise. Dr. McCabe, M.D. clearly showed his intention, by his silence, to hide his medical malpractice, dishonest medical reporting. This is a violation of standard of care, practice of medicine,

"Patient's Rights, "informed" consent, and "physician-n-patient" relationship; contributing and causing plaintiff, pro se, further aggravation of his multiple medical conditions; and violated his protectable interest and reputation as a compliant patient.

45. On *September 4, 2002*, defendant ordered plaintiff, pro se, to violate doctor-patient relationship with Dr. Pulliam, M.D., Cardiologist, and his medical orders, "*not to deviate from prescribed medications, even by brand name*" by taking a "generic" equivalent; and plaintiff, pro se, was "noncompliant" towards defendant's orders, *absent cardiologist's orders*. This is a violation of the standard of care, practice of medicine, "Patient's Rights", and "informed" consent, when administrative policy conflicts with doctor's practice of medicine, and medical orders, to plaintiff, pro se. Consequently, plaintiff, pro se, health, welfare, and safety were unnecessarily compromised by defendant; which aggravated his various medical conditions, and possibly and probably, could have resulted in his loss of life, or death.

35

46.  Further, defendant does not have the right
to practice medicine, in Alaska; only licensed physicians
can practice medicine, lawfully.  However, there is a fine
line between practicing medicine and defendant's
administration of benefits; according to "Patient's Rights"
and "Patient Safety".  In particular medical benefit
circumstances,  [former] Secretary, VA, Anthony J.
Principi, stated: *"Veterans with heart attack symptoms who
go to VA hospitals may, if there treatment requires it, be
moved to other nearby hospitals with a wider range
of cardiac service."  That is just one of the
changes ordered by Secretary VA, Anthony J. Principi,
after a new [VA] study found cardiac patients in its
hospitals had consistently higher mortality rates
than similar Medicare patients treated in non-VA
hospitals.  The study found 50.2 percent of veterans
with heat attacks who were treated by VA hospitals
died within three years, compared to 40.5 percent
of Medicare patients treated in community hospitals.
Because prompt treatment is crucial, Secretary,
VA, Principi, "urged veterans with heart attack*

*symptoms to go to any nearby hospital."* **Alaska Heart Institute, Providence Hospital, Anchorage, Alaska, is certainly much closer than VA hospital, Seattle, Washington. [Also, defendant doesn't have adequate and appropriate cardiac services in Alaska; and the Alaska Heart Institute is the most immediate and prompt treatment for plaintiff, pro se, multiple heart conditions, caused by defendant.]**

47. **On** *September 5, 2002,* **Ms. Kathleen M. Colling, RN, defendant's employee, called Dr. Anschuetz, M.D., Cardiologist, office; and she was informed by Dr. Anschuetz, M.D. that** *the prescribed regiment of medication by Dr. Pulliam, M.D., Cardiologist, to plaintiff, pro se, was not to be deviated from, until plaintiff, pro se, next cardiology consult.*

48. **On or about,** *October 11, 2002,* **defendant authorize plaintiff, pro se AICD cardiology consult, with Dr. Peterson, M.D.; and** *no change was ordered to Dr. Pulliam, M.D. original prescription orders.*

49. **On or about,** *November 22, 2002,* **plaintiff, pro**

se, notified defendant he would run out of medication,
Carvedilol, before refill reaches him by mail from
AKVAHSRO, pharmacy.  AKVAHSRO *authorized 14 day supply
of medication, Carvedilol, be locally purchased, in
Fairbanks.*

50.    When plaintiff, pro se, received his refill
medications from AKVAHSRO, pharmacy, there were *generic
equivalents* of  Coreg and Lisinopril; not the medications
ordered by Dr. McCabe, M.D.  Plaintiff, pro se, [pursuant
to Dr. Pulliam, M.D., Cardiologist, medical orders]
complained to Dr. McCabe, M.D., who explained to
plaintiff, pro se, *that he could do nothing about
defendant's actions; and it was not his problem*, or words
to that affect.  Plaintiff, pro se, complained to
Chief of Pharmacy [COP], AKVAHSRO, about medication refills
not to be deviated from prescribed medication list, even by
generic equivalent; and COP responded, *it was VA policy
to change doctor's prescription orders and substitute
generic equivalents – even when prescription orders are not
to be deviated from, by brand name.  The VA "formulary"
must be followed and maintained!* Plaintiff, pro se,

further, complained to Asst. Chief, Clinical Affairs, Mr.
T. Woodworth, AKVAHSRO, about COP. Plaintiff, pro se,
explained to Mr. Woodworth, he was medically ordered
by cardiologist, Dr. Pulliam, M.D., not to deviate from
regiment prescription list, even by brand name; and
Dr. McCabe, M.D. ordered his medication refills [according
cardiologist's orders]. However, COP refused to refill
his prescriptions as ordered, without generic equivalents.
Mr. Woodworth responded that he would make an inquiry
into his complaint, and get back to plaintiff, pro se,
later.

51.  Asst. Chief, Clinical Affairs, Mr. T. Woodworth,
AKVAHSRO, contacted plaintiff, pro se, about #49 & #50
above, and informed him that he [Mr. Woodworth] consulted
with 2 AKVAHSRO doctors about the difference between brand
name and generic equivalent drugs; and he [Mr. Woodworth]
was medically advised there were no differences, by the
doctors. *He ordered plaintiff, pro se to take the
generic equivalents, as refilled by COP*. Plaintiff, pro
se, asked Mr. Woodworth to inform him of the names of
the 2 doctors he consulted; and Mr. Woodyard *refused to*

*identify the doctors.* **This is unlawful practice of medicine by COP and Mr. Woodworth; medical malpractice; "dereliction of duty" and "abuse of power" by executive administrators; gross negligence interfering with managed care, "continuity of care" and doctor orders, violating standard of care, practice of medicine; "informed" consent" and "Patient's Rights". Consequently, contributing and causing aggravation of plaintiff, pro se, multiple medical conditions; and his health, welfare, and safety, possibly and probably, loss of life, and death.**

**52. On _January 22, 2003_, pursuant to Radiology consult, Fairbanks Memorial Hospital, plaintiff, pro se, first learned he was absent left kidney.** *Throughout his entire life, and, specifically, his more than 9 years of military service, from induction physical to discharge physical, and afterwards; and including his C&P [Compensation and Pension] examination, by VA [Veterans Affairs], and subsequent VA medical treatment and care; plaintiff, pro se, was never informed, by anybody, he was missing his left kidney.* **This is a continuous medical malpractice, beginning in _1971_; and**

possibly and probably, contributing to plaintiff, pro se, existing multiple medical conditions.

53.  On *February 5, 2003*, plaintiff, pro se, informed Dr. McCabe, M.D. that veteran, William H. Joy's medicals were included into his medicals.  *Dr. McCabe, M.D. intentionally, knowingly, and willing failed to report into plaintiff, pro se medicals that veteran, William H. Joy's [deceased] medicals were included in Plaintiff, pro se, medicals.*  **This is a violation of the standard of care, practice of medicine, "Patient's Rights", "informed" consent, and fraud.  Consequently, Dr. McCabe, M.D. medical malpractice contributed, and aggravated, plaintiff, pro se, multiple medical conditions.  [Veteran, William H. Joy, medicals were given to Dr. McCabe, M.D.; and BVA {Board of Veterans Appeals}].**

54.  Between *July 17, 2002* to *February 5, 2003*, Dr. McCabe, M.D. managed care and medical treatment of plaintiff, pro se, *included the medicals of veteran, William H. Joy* [deceased].  **Dr. McCabe, M.D. never informed**

plaintiff, pro se, *his managed care and practice of medicine, was appropriate, accurate, and didn't interfere with plaintiff, pro se, health, welfare and safety, because his medical records were contaminated by William H. Joy, medicals.* Consequently, plaintiff, pro se, suffered aggravation to his multiple medical conditions. This is a violation of standard of care, practice of medicine, "Patient's Rights", informed consent, and fraudulent practice of medicine.

55.  At no time, between *July 17, 2002* to present, defendant never inform plaintiff, pro se, about the effects and consequences of Dr. McCabe, M.D. medical treatment and care for his multiple medical conditions. This is a violation of the standard of care practice of medicine, "Patient's Rights", informed consent, including "dereliction of duty" and "abuse of power" by executive employees; in an effort to hide their medical records error.  Consequently, contributing and causing him to suffer aggravation of his multiple medical conditions.

56.  On *January 27, 2003*, Dr. McCabe, M.D. prescribed

medication, Gemfibrozil, without explaining the benefits and adverse effects, to plaintiff, pro se. Consequently, plaintiff, pro se, suffered and got sick, nauseated, headache, extreme diarrhea, shortness of breath, "heart hurting" muscle aches, pain and cramping, until he stop taking the medication. *Gemfibrozil adversely reacts to anticoagulants and simvastatin.* Dr. McCabe, M.D. had to know plaintiff, pro se, was taking warfarin [Coumadin], anticoagulant and Zocor, simvastatin. This is a violation of the standard of care practice of medicine, "Patient's Right", and informed consent; consequently, contributing and aggravating his multiple medical conditions. Further, plaintiff, pro se, contends he was not informed, nor did he consent, to defendant's research study about Gemfibrozil.

57. On or about *February 28, 2003*, and because plaintiff, pro se "triglycerides" increased from normal to 2,000, then over 5,000; and "cholesterol" increased, incrementally; he asked Dr. McCabe, M.D. if he was diabetic. Dr. McCabe, M.D. responded *plaintiff, pro se was not diabetic; however he had no explanation*

*why plaintiff, pro se "Triglycerides" and "cholesterol"*
*were out of control.* **Plaintiff, pro se, asked**
**Dr. McCabe, M.D. to order a "GTT" diabetes test.**
**Dr. McCabe, M.D.** *ordered "GTT" diabetes test; but*
*subsequently, cancelled "GTT"; without any*
*explanation given to plaintiff, pro se.* **This is a**
**violation of the standard of care, practice of medicine;**
**"Patient's Rights"; "informed" consent; and intentional**
**efforts to hide his misdiagnosis, medical mistake and**
**error; with the assistance of defendant. Plaintiff,**
**pro se, was also denied his protectable right to**
**be in-charge of his person, in the decision process**
**of his own medical treatment and care, by defendant.**

**58. Plaintiff, pro se, does not have any control**
**over what is written into his medicals; and it is the**
**absolute privilege of the doctor, and defendant, to write**
**whatever they please, for whatever their reasons, into**
**plaintiff, pro se electronic medicals. Plaintiff, pro**
**se, medicals are in such a disarray, and are intentionally,**
**knowing, willing, and falsely altered to such an outrageous**
**condition, it's practically impossible for anybody to make**
**any real sense of the medical reports, including plaintiff,**

44

pro se. This is medical malpractice and violation of the standard of care practice of medicine. If plaintiff, pro can't understand his own medicals; how can any other subsequent medical professional, or doctor, make sense of his medicals, too!

59.  On *April 1, 2003*, Dr. McCabe, M.D. prescribed medication, Quinine sulfate 325 mg hs prn cramps, without explaining the benefits and adverse effects of medications to plaintiff, pro se. This is a violation of the standard of care practice of medicine, "Patient's Right", and informed consent; consequently, contributing and aggravating his multiple medical conditions.

60.  On *April 1, 2003*, LPN Lord's medical entry/note about plaintiff, pro se, "not taking" prescribed medication, Synthroid, 0.05 mg per day, is intentionally incorrect; and a conscious effort to show he is "non-compliant". AKVAHSRO refused to correct plaintiff, pro se, electronic medicals, as reported by LPN Lord's medical entry/note; *even though, on February 28, 2003, Dr. McCabe, M.D. ordered plaintiff, pro se, to stop taking*

*Sythroid medication, as noted in his treatment plan.*
This is a violation of the standard of care, practice of
medicine, "Patient's Right", and informed consent.
Consequently, contributing and aggravating his multiple
medical conditions, subsequent personal injury; and
executive misconduct, "dereliction of duty", "abuse of
power", and totally unjustified and unreasonable.

61. Further, plaintiff, pro se, contends that
when Dr. McCabe, M.D. ordered him to stop taking
Sythroid medication, as prescribed by Dr Pulliam, M.D.,
without any further cardiologist's order supporting
his medical decision, caused and contributed to plaintiff,
pro se, subsequent emergency hospitalization, medical
condition and diabetes. This is medical malpractice and
violation of standard of care practice of medicine.

62. Because "physician-n-patient" relationship,
between plaintiff, pro se, and his provider, Dr. McCabe,
M.D., deteriorated where plaintiff, pro se, didn't trust
Dr. McCabe, M.D. further medical treatment and care; and
on or about, *May 13, 2003*, he submitted a complaint to

Manager, Fairbanks VA, CBOC, about Dr. McCabe, M.D. *requesting another doctor, pursuant to 38 C.F.R., "Patient's Rights"*. **Defendant responded by retaliating against plaintiff, pro se,** *by creating the most restrictive "continuity of care" for him.* **This is a violation of the standard of care, practice of medicine; "dereliction of duty" and "abuse of power" by executive employees; "Patient's Rights"; informed consent; and unlawful retaliation, in an effort to cause serious medical consequences, and possibly and probably, loss of life and death; and "Whistleblower Protection Act" of 1989, Pub. L. No. 101-12, 103 Stat. 16 [codified as amended in Scattered sections of Title 5 of United States Code]; laws, rules regulations, polices, directives, mandates, and directives.**

    63.  **Between** *May 13, 2003* **and** *October 21, 2003*, **AKVAHSRO, Asst. Chief, Clinical Affairs Mr. T. Michael Woodyard, [who is not a doctor]** *ordered Fairbanks VA, CBOC, that, any and all, "continuity of care" and medical treatment and care concerning plaintiff, pro se, were to be referred to him, directly.* **During this period, and before**

Ms. Brenda Young, LPN, diagnosed plaintiff, pro se, diabetic, pursuant to lab tests, Mr. Woodyard, *repeatedly denied plaintiff, pro se, continuous requests for "continuity of care", and medical treatment and care, to see another doctor, other than Dr. McCabe, M.D., at Fairbanks VA, CBOC.* In the alternative, Plaintiff, pro se, requested to see a *military doctor at BACH, or a "fee-basis" doctor in Fairbanks, until AKVAHSRO assigned another provider to Fairbanks VA, CBOC*; and Mr. Woodyard denied plaintiff, pro se, request for "continuity of care", medical treatment and care, and life-supporting medications, for his multiple heart conditions; including newly diagnosed diabetes, by Ms. Young, LPN . Even though plaintiff, pro se, explained *traveling to Anchorage VA, CBOC [380 miles away; and 760 miles roundtrip from Fairbanks-to-Anchorage-n-return] was medically impossible for him, Mr. Woodyard, denied his request to see another doctor, other than Dr. McCabe, M.D., in Fairbanks, Alaska.* When plaintiff, pro se, asked Mr. Woodyard, if he was aware of any problems sending 1 of the 6 doctors at Anchorage VA, CBOC, to Fairbanks VA, CBOC, [until they

were assigned their second doctor] for him to see; Mr. Woodyard responded, he saw no problem with plaintiff, pro se, idea. However, Mr. Woodyard further stated *he would not authorize plaintiff, pro se, to see any other doctor in Fairbanks, except Dr. McCabe, M.D.; and he didn't care if plaintiff, pro se, had to travel to Kenai VA, CBOC [which is even farther for plaintiff, pro se, to travel than Anchorage] for a provider.* This is unlawful practice of medicine; medical malpractice; "dereliction of duty"; "abuse of power"; intentional endangerment and harm by medical consequences – in an effort to literally "end" further administrative processes, by, possibly and probably, causing loss of life, or death; retaliation; informed consent; "Patient's Rights"; and violation of the law, rules, regulations, procedures, policies and directives. Consequently, plaintiff, pro se, suffered terrible mental anguish by Mr. Woodyard's efforts to demoralize plaintiff, pro se, including further personal injuries and aggravation of pre-existing medical conditions. [*Plaintiff, pro se, was treated worse than a POW {Prisoner of War}, or a convict in prison!*

*Plaintiff, pro se, believes Mr. Woodyard, intentionally,*
*knowingly, willingly and strategically attempted to kill*
*him administratively, without any "due process of law", or*
*judicial orders -and nobody plaintiff, pro se complained*
*to "gave a care", including Director, AKVAHSRO, VISN 20,*
*VAOIG [Veterans Affairs Office of Inspector General] and*
*VAOGC [Veterans Affairs Office of General Counsel].*

64. Between *October 21, 2003*, when Ms. Brenda
Young, LPN, diagnosed plaintiff, pro se, diabetic, pursuant
to lab tests, and medicals, to *November 26, 2003*,
defendant denied him "continuity of care" and medical
treatment and care, medical testing and labs, prescriptions
or any medical benefits, contrary to his VA rating, because
plaintiff, pro se, complained about their provider, Dr.
McCabe, M.D; and because he requested another provider,
other than Dr. McCabe, M.D. This is a violation of the
standard of care, practice of medicine; "dereliction of
duty" and "abuse of power" by executive employees;
"Patient's Rights"; informed consent; and unlawful
retaliation, in an effort to cause serious medical
consequences, and possibly and probably, loss of life and

death.

65.  Plaintiff, pro se, requested pre-approval authorization to see "fee-basis" Dr. Ticman, M.D., on *November 26, 2003*, because he was seriously sick.  Mr. Woodyard denied his request to see Dr. Ticman, M.D., for emergency medical treatment.

66.  Anyway, on that date, *November 26, 2003*, plaintiff, pro se, saw Dr. Ticman, M.D. who examined him and ordered an "ambulance" to take plaintiff, pro se, directly to "ICU", Fairbanks Memorial Hospital, because plaintiff, pro se, was dying.  Dr. Ticman, M.D. asked plaintiff, pro se, *why defendant was trying to kill him*!?  The "ambulance" arrived and medically escorted plaintiff, pro se, to "ICU", where Dr. Starks, M.D. took charge of him.  Dr. Starks, M.D. *diagnosed plaintiff, pro se, suffering heart attacks, due to extreme pancreatitis caused by diabetes*.  Dr. Starks, M.D ordered plaintiff, pro se, "*life-line*" *to Alaska Heart Institute, Providence Hospital, because of his multiple heart conditions and Fairbanks Memorial*

*didn't have the resources to treat plaintiff, pro se,*
*medical emergency, safely;* **and AKVAHSRO,**

**COS, Dr. Cynthia A. Joe, M.D., denied plaintiff, pro se,**
**emergency medical evacuation; until [USA] CPT. Dr. Hawley,**
**M.D., BACH, concurred.** *Dr. Starks, M.D. apologized to*
*plaintiff, pro se, about what was happening to him.*
**This is a violation of the standard of care, practice**
**of medicine; "dereliction of duty" and "abuse of**
**power"; "Patient's Rights" and "Patient's Safety";**
**laws, rules, regulations, policies, mandates, and**
**directives. Also, COS, Dr. Joe, M.D., was in**
**direct violation of EMTALA; and treating doctors orders!**

**67.** **In the meantime, on** ***November 28, 2003****, and while*
*plaintiff, pro se, was medically confined in "ICU" fighting*
*for his life, and before plaintiff, pro se, saw CPT Dr.*
*Hawley, M.D.; Ms. "Rosie", Manager, Fairbanks VA, CBOC,*
*pursuant to COS, Dr. Cynthia A. Joe, M.D. orders, demanded*
*plaintiff, pro se, sign a "Healthcare Agreement".*
*Plaintiff, pro se, couldn't believe Ms. "Rosie" indignant,*
*uncaring, disrespectful, and outrageous behavior and*

*demand.* **Plaintiff, pro se, got "mad" and exclaimed, he
wouldn't sign anything while in "ICU" fighting to stay
alive; and until he had all of his senses to understand the
unreasonableness of defendant's COS, Dr. Joe's, and her
intentional interference with his emergency medical
treatment, he didn't give a "damn" what COS, Dr. Joe
demanded; and for Ms. "Rosie" to get out of his room. Ms.
"Rosie" tossed an envelope on the chair in plaintiff, pro
se, "ICU" room, and departed. Because, plaintiff, pro
se, was so upset and "mad" his** *heart stopped,
and his "AICD" fired and restarted his heart.* **This is
medical malpractice; violation of the standard of care,
practice of medicine; harassment of the worst kind;
"dereliction of duty"; "abuse of power"; intentional delay
of emergency medical orders to "life-line" plaintiff, pro
se, in order to demand plaintiff, pro se, signature on
"Healthcare Agreement" [which had nothing to do with his
present emergency; and everything to do with defendant's
denial of plaintiff, pro se, previous "continuity of care",
medical treatment and care, and life supporting
medications]; and the law, rules, regulations, policies,**

and directives. Further, COS, Dr. Cynthia A. Joe, M.D.,
had to know, when Dr. Starks, M.D. ordered plaintiff, pro
se, "life-line" to Alaska Heart Institute, Providence
Hospital, the seriousness of plaintiff, pro se, medical
emergency and conditions, and that any delays could,
possibly and probably, cause him loss of life, or death;
and she was in direct violation of [former] Secretary,
Veterans Affairs, Anthony J. Principi, order, that
*"Because prompt treatment is crucial he [Secretary*
*Principi] urged veterans with heart attack symptoms*
*to go to any nearby hospital."* Plaintiff, pro
se, believes COS, Dr. Cynthia A. Joe, M.D. intentionally,
knowing, willingly, and strategically attempt to murder
plaintiff, pro se, by medical means, by creating the
the most restrictive measures for plaintiff, pro se,
to get medical treatment and care benefits; which were
contrary to plaintiff, pro se, VA rating. Further,
COS, Dr. Joe's "Healthcare Agreement" had nothing to do
with plaintiff, pro se, emergency medical condition, and
Dr. Starks, M.D. order to "life-line" plaintiff, pro
se, to Alaska Heart Institute. *CPT Dr. Hawley, M.D.,*
*BACH, concurred with Dr. Starks, M.D. order to*

*"life-line"* *plaintiff, pro se, to the Alaska Heart Institute, because of his heart;* but that wasn't his call. [Plaintiff, pro se, never fully understood what CPT Dr. Hawley, M.D. meant when he said to him "but that wasn't his call".

68. Between Dr. Starts, M.D. and CPT Dr. Hawley, M.D., emergency medical care and treatment for plaintiff, pro se, diabetes, his medical emergency improved. Plaintiff, pro se, discharged himself from the hospital. CPT Dr. Hawley, M.D. instructed plaintiff, pro se, to have labs drawn before his "post discharge examination", by him. Plaintiff, pro se, had labs drawn before "post discharge examination", by CPT Dr. Hawley, M.D. CPT Dr. Hawley, M.D. examined him, ordered plaintiff, pro se, prescriptions refilled, including diabetic medication; and scheduled appointment for plaintiff, pro se, with Dr. Miller, M.D. [GP], Fairbanks VA, CBOC, on *December 17,* CPT Dr. Hawley, M.D. [IM] ordered plaintiff, pro se, labs to be taken the day before medical appointment with Dr. Miller, or, on or about, *December 17, 2003*.

69. Before appointment on *December 17, 2003*,

plaintiff, pro se, had labs drawn.  When plaintiff, pro se, arrived for his scheduled medical appointment with Dr. Miller, M.D., Ms. "Rosie", Manager, Fairbanks VA, CBOC, met him, with the Military Police, and **substantially stated,** *unless plaintiff, pro se signed the "Healthcare Agreement", he was denied "continuity of care", medical treatment and care, and prescriptions; and to leave Fairbanks VA, CBOC, facility.*  **Plaintiff, pro se,** responded substantially that he was a 100% disabled service-connected, total and permanent, without an further evaluation, because medical condition were not expected to improve, and he had "Patient's Rights"; and he departed BACH.  This is medical malpractice; violation of the standard of care, practice of medicine; "dereliction of duty"; and "abuse of power"; and violation of  the law, rules, regulations, policies, directives; and health, welfare, and safety of plaintiff, pro se.

70.  Between *December 17, 2003*, and *May 23, 2004*, defendant denied plaintiff, pro se, "continuity of care" and life-supporting heart and diabetes medications; contrary to plaintiff, pro se, VA rating.  Consequently,

plaintiff, pro se, multiple medical conditions and diabetes deteriorated and he was; again, emergency hospitalized, at Fairbanks Memorial Hospital.  COS, Dr. Joe, M.D., did not allow Dr. Miller, M.D. to assist in plaintiff, pro se, emergency medical treatment and care, at Fairbanks Memorial Hospital; nor CPT Dr. Hawley, M.D.  On about _May 27, 2004_, doctor-n-charge ordered plaintiff, pro se, to be "life-line" to Alaska Heart Institute, Providence Hospital; and COS, Dr. Joe, M.D. intervened to stop emergency medevac. _The doctor-n-charge substantially informed COS, Dr. Joe, M.D., she was not the treating physician of record; and plaintiff, pro se, will certainly dye if he is not "life-line" to Alaska Heart Institute; and her threats of non-payment for medical services rendered is entirely another matter; and will be resolved after plaintiff, pro se, emergency conditions are resolved.  The doctor-n-charge told plaintiff, pro se, he was not going to let the idiotic decisions of defendant kill his patient_!  **This is a violation of the standard of care, practice of medicine; intentional interference with emergency treating physicians duty to patient; threat by intimidation, to deny payment**

for medical services rendered, to stop emergency treating physician's order to "life-line" plaintiff, pro se, to Alaska Heart Institute, because Fairbanks Memorial Hospital did not have the resources to adequately treat plaintiff, pro se, emergency conditions; attempted murder of plaintiff, pro se, by medical means by COS Dr. Cynthia A. Joe, M.D. and Dr. Leslie Burger, M.D., VISN 20; and laws, rules, regulations, policies, and directives; "Patient's Rights"; and "Patient's Safety".

71.  Plaintiff, pro se, almost died because of last medical emergency, caused by defendant's denial of "continuity of care", medical treatment and care and life-supporting medications; contrary to plaintiff, pro se, VA rating.  As a result of defendant's medical malpractice, plaintiff, pro se required a 5-way heart by-pass. *The "Endocrinologist", Dr. Nolan, M.D. told plaintiff, pro se, to never ever stop taking medication, "Synthroid"; and if any doctor orders him to stop taking medication "Synthroid", refer the doctor to him!* Dr. McCabe, M.D. ordered plaintiff, pro se, to stop taking medication, "Synthroid".  Defendant caused plaintiff, pro

se, medical conditions by retaliating against him because he asserted his "Patient's Rights"; and requested a different provider, other than Dr. McCabe, M.D. Defendant imposed the most severe restrictions for medical treatment and care, including deny him life-supporting medications for his heart and diabetes, contrary to his VA rating.

72. Defendant fabricated, and falsely accused, plaintiff, pro se, as a "noncompliant" and "violent" patient, after he submitted complaint against provider, Dr. McCabe, M.D. *Since 1987, when plaintiff, pro se, first, contacted defendant, to when he asserted his "Patient's Rights", requesting another provider, other than Dr. McCabe, M.D. [2002], nowhere is it reported in his medicals that he is "noncompliant", or a "violent" patient! Additionally, plaintiff, pro se, has been previously, evaluated by defendant's mental health practitioners, and determined "nonviolent."* However, defendant convened a "Behavior Management Committee" [BMC] and failed to give plaintiff, pro se, proper written notice; denied his request for an "extension", when defendant first, telephonically, notified him about hearing date. Defendant

appointed Mr. Woodyard as plaintiff, pro se, representative at the board; even though defendant, had to know , Mr. Woodyard was a board-member. Plaintiff, pro se, objected to Mr. Woodyard appointed representation; and defendant appointed a different board-member. Plaintiff, pro se, objected and defendant refused to assign him another representative; and convened the board. Essentially, plaintiff, pro se, was denied any semblance of "fairness", "due process" "representation"; nor any opportunity to face his accuser, or rebut any evidence. BMC decided and ordered plaintiff, pro se, to sign a "Healthcare Agreement", after his second emergency hospitalization, caused by defendant refusing him "continuity of care", medical treatment and care, life-supporting medications; and newly diagnosed medical condition, Type II, Diabetes. Plaintiff, pro se, electronic medicals were adversely flagged, on March 23, 2004; stating: "*All PFR are advisory only.  No patient should be denied access to care for a life threatening emergency  on the basis of PFR*". Dr. Leslie Burger, M.D., VISN 20, decision on plaintiff, pro se, appeal is inappropriate, because

of his participation in fraud and medical malpractice.
Dr. Burger, M.D., as well as, Dr. Joe, M.D.,
respectively, acted contrary to defendant's rules,
regulations, polices, directives and information
letters; and they are motivated to hide their shame,
dishonor, and medical malpractice towards plaintiff,
pro se, in anyway whatsoever they can, by use of
their position and office.

73. Plaintiff, pro se, contends his behavior
towards defendant is not different than United States Vice
President, Dick Cheney behavior when he blurted out
obscenity at Democratic Senator Patrick Leahy of Vermont
during a heated exchange on the Senate floor. He further
contends, and agrees, with Vice President, Cheney's
point: "I expressed myself rather forcefully, felt
better after I had done it." The vice president
further stated those who heard the putdown agreed
with him. "I think that a lot of my colleagues felt
that what I had said badly needed to be said, that
it was a long overdue." Plaintiff, pro se,
is not threatening, intimidating, or violent!

However, if defendant did what they have done to plaintiff, pro se, to Vice President, Cheney, plaintiff, pro se, contends, and believes, he [vice president] would not be as unreasonably kind, as him [plaintiff, pro se]!
[Vice President Cheney has substantially the same heart problems as plaintiff, pro se; and he has an AICD, too.

74. Plaintiff, pro se, contends, he [and every veteran] is entitled to the same, and equal, medical coverage as the Commander-n-Chief, President of the United States; anything less is "unlawful", "unfair" and not "right".

75. Plaintiff, pro se, contends, arbitrary, capricious, contrary, unreasonable, illogical and conflicting laws, rules, regulations, policies, directives, etc., between Secretary, Department of Defense [DoD] and Secreatary, Veterans Affairs [VA] where DoD condones as acceptable military behavior and conduct, alcohol and tobacco use; however, it is later condemn as "willful misconduct" by the VA, is to conflicting, wrong, and not "right". It is not right to extend the "Feres"

doctrine, by legislative means, into the VA to deny
veterans the same medical coverage as their Commander-
n-Chief, President of the United State of America. In
a legal and logical sense, there is no difference between
Command-n-Chief and military service! Therefore,
plaintiff, pro se, enlarges his FTCA to include
"tobacco related illnesses", pursuant to BVA rating
"nicotine dependent", with 0% compensation. [Pendant
lawsuit is United States of America v. Philip
Morris Incorporated, et al., Civil Action N. 99-2496 (GK),
United States District Court For The District Of
Columbia; presiding U.S. District Judge: Ms. Gladys
Kessler. See Judge Kessler's "Final Decision";
Schwab et al. v. Philip Morris USA, Inc et al.,
Class Action Lawsuit No. 04-CV-1945 (JBW)(SMG).]

76. Plaintiff, pro se, contends defendant has
virtually violated every AMA [American Medical
Association], "*Principles of medical ethics*":

> *I.   A physician shall be dedicated to*
> *providing competent medical care, with*
> *compassion and respect for human dignity*
> *and rights.*

II.  A physician shall uphold the standard
of professionalism, be honest in all


professional interactions, and strive to
report physicians deficient in character
or competence, or engaging in fraud or
deception, to appropriate entities.


III. A physician shall respect the law and
and also recognize a responsibility to seek
changes in those requirements which are
contrary to the best interest of the patient.


IV.  A physician shall respect the rights of
patients, colleagues, and other health
professionals, and shall safeguard patient
confidences and privacy with the constraints
of the law.


V.   A physician shall continue to study,
apply, and advance scientific knowledge,
maintain a commitment to medical education,
make relevant information available to
patients, colleagues, and the public, obtain
consultation, and use the talents of other
health professionals when indicated.


VI.  A physician shall, in the provision of
appropriate patient care, except in emergencies,
be free to choose whom to serve, with whom
to associate, and the environment in which to
provide medical care.


VII. A physician shall recognize a responsibility
to participate in activities contributing to the
improvement of the community and the betterment
of public health.

> VIII. A physician shall, while caring for a
> patient, regard responsibility to the patient
> as paramount.
>
> IX.  A physician shall support access to
> medical care for all people.

[Adopted by the AMA's House of Delegates, June 17, 2001.]

77.  Plaintiff, pro se, avers, defendant has acted
contrary, and unlawfully, towards plaintiff, pro se, VA
rating, denying him medical treatment and care.
Consequently, defendant, by creating the most restrictive
measures, caused plaintiff, pro se, to suffer aggravation
to his multiple medical conditions; and other personal
injuries.  [A "decision not to warn of a specific,
known hazard for which the acting agency is responsible
is not the kind of broader social, economical, or
political policy decision that the discretionary function
exception is intended to protect." Sutton, 26 F.3d at.
Further, "the discretionary function exception
will not apply when a federal statute, regulation, or
policy  specifically prescribes a course of action
for an employee to follow.  In this event, the
employee has no rightful option but to adhere to the
directive." Berkovitz v. U.S., 486 U.S. 531 (1988);

*Kennewick Irrigation District v. U.S.,* 880 F.2d
1018 (9th Cir. 1989).]

78. Plaintiff, pro se, was intentionally denied a
copy of "Chief of Medicine" [COM] independent review
of his medical treatment and care by provider, Dr.
McCabe, M.D.; their employee. Consequently, plaintiff,
pro se, had no opportunity to provide rebuttal
"expert" evidence to "Chief of Medicine" opinion.
This is further "abuse of power" by defendant not
following the laws, regulations, rules, policies,
etc; as well as, violating the standard of care,
practice of medicine. Further, plaintiff, pro se,
suffered adverse action by COM's opinion, by
BMC. Simply, if plaintiff, pro se, doesn't
know what COM opined than he can't respond.

79. <u>It is an indisputable fact</u>, that
defendant, scheduled an appointment for plaintiff,
pro se, to see their cardiologist, Dr. Zen, M.D.
At appointment, Dr. Zen, M.D. explained to him
that he didn't have his medicals, because he had
left them at home [personal residence]. However,

Dr. Zen, M.D. assured him that he had reviewed his medicals; and he was fully aware of plaintiff, pro se, medical conditions. Plaintiff, pro se, contends *his medicals, which were sent from Fairbanks VA, CBOC, Fairbanks, Alaska, didn't arrive to Dr. Zen, M.D., until after plaintiff, pro se, appointment; and the next day.* **Further,** *it is impossible for Dr. Zen, M.D. to have reviewed plaintiff, pro se, medicals, and to have left them home, when his medicals arrived at AKVAHSRO the next day.* **Therefore, plaintiff, pro se, contends there is no violation of his "privacy" by Dr. Zen, M.D. taking his medicals to his personal residence, because his medicals hadn't arrived at AKVAHSRO before his appointment with Dr. Zen, M.D.; but afterwards. However, plaintiff, pro se, contends Dr. Zen, M.D. lied to him; and he failed to inform plaintiff, pro se. Further, plaintiff, pro se, contends Dr. Zen, M.D. submitted his cardiology consult to Dr. McCabe, M.D.; praising Dr. McCabe, M.D. for doing an outstanding job with plaintiff, pro se, cardiology problems.**

WJ JOURNEY v. USA

This is medical malpractice, negligence, and violation of standard of care, practice of medicine, informed consent, laws, regulations, rules, policies, etc, and outrageous professional medical conduct and behavior; causing, contributing, and aggravating plaintiff, pro se, medical conditions.

80.   Plaintiff, pro se, contends he is protected, in the same way and manner, as VA employees, by "Wistleblowing Protection"; and "Patient's Rights".

81.   Plaintiff, pro se, contends 1998 MSA [Master Settlement Agreement]; DOJ [Department of Justice] Civil Case No. 99-CV-02496(GK), United States District Court For The District Of Columbia; and Civil Case No. 04-CV-1945 (JBW)(SMG), United States District Court For The Eastern District Of New York, are related.   Therefore, Plaintiff, pro se, incorporates all, and everything, of related cases into his complaint.

82.   Plaintiff, pro se, will identify Does 1-100, and include them, respectively, into his complaint, as they become known to him.

THEREFORE, AND BECAUSE of all that is stated above in plaintiff, pro se, complaint, he prays the court to order the following:

Defendant to pay, the sum certain amount of: $10,000,000.00 [ten million dollars &/no cents; US currency], to plaintiff, pro se, in damages, for his personal injuries caused by defendant's egregious violations, medical malpractice, negligence, fraud, and "abuse of power"; and any other matters deemed appropriate by the court.

Respectfully submitted,

October 20, 2006

William J. Journey
Plaintiff, pro se
P.O. Box 72969
Fairbanks, Alaska 99707
Ph: 9073892858
Fax: 9073892858
E-mail: dogsledteam@hotmail.com